**STATE OF MISSOURI, Plaintiff,**

v.

**NATIONAL ORGANIZATION FOR WOMEN, INC., Defendant.**

**No. 78 4053 CV C.**

United States District Court, W. D. Missouri, C. D.

Feb. 21, 1979.

Amended March 16, 1979.

---

John E. Vanderstar, Donna L. Kohansky, Covington & Burling, Washington, D. C., for defendant.

Roger Bern, Walter O. Theiss, Gregory D. Hoffmann, Nanette K. Laughrey, Asst. Attys. Gen., Jefferson City, Mo., for plaintiff.

OPINION AND ORDER

ELMO B. HUNTER, District Judge.

The State of Missouri brings this action for injunctive relief against the National Organization for Women, Inc. (NOW) under § 16 of the Clayton Act, 15 U.S.C. § 26. Missouri alleges that NOW has engaged in a combination and conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Missouri also alleges that NOW's conduct violates the Missouri antitrust statute, § 416.031.1, RSMo, and constitutes the tortious intentional infliction of economic harm without legal justification or excuse. This Court has jurisdiction over the federal antitrust claim under 28 U.S.C. § 1337 and pendant jurisdiction over the state law claims.

Missouri is a sovereign state of the United States and brings this action in that capacity and as *parens patriae*. NOW is a nonprofit membership corporation organized under the laws of the District of Columbia. It has approximately 77,000 members nationwide, half of whom belong to 690 local chapters. These chapters and individual members are organized into a national federation with the stated purpose of bringing women "into full participation in the mainstream of American society."

I. *Factual Findings*

The factual basis for Missouri's Complaint can be supplied by this single stipulation of fact:

> NOW has sought to persuade and urge those organizations that support making equal rights for women a part of the Constitution to refrain from holding conferences, conventions, and meetings in unratified states.

It is necessary, however, to place NOW's activities within the broader series of occurrences leading to the filing of this action and therefore to set out a summary of the substantial record before the Court.

The proposed Equal Rights Amendment to the Constitution (ERA) was passed by both houses of Congress and submitted to the states for ratification on March 23, 1972.[1] The ERA has been ratified by the legislatures of thirty-five states, short of the thirty-eight required for the amendment to become a part of the Constitution.[2] Ratification of the ERA became a hotly-contested issue in many states, and, as is characteristic of the political system in this country, various individuals and organizations undertook lobbying efforts to influence legislators, both in support and in opposition. Such efforts have included giving testimony before legislative committees, personal contacts with legislators, letter writing campaigns, and solicitation of media attention. Many national membership organizations and associations, including NOW, have engaged in such lobbying.

As early as April of 1975, the National Federation of Business and Professional Women (BPW), a large national women's organization, retained a political consultant and consulting firm to advise the group on

1. H.R.J. Res. 208, 92d Cong., 2d Sess., 86 Stat. 1523 (1972) provides:

> Section 1. Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
>
> Sec. 2. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.
>
> Sec. 3. This amendment shall take effect two years after the date of ratification.

2. U.S.Const. art. V.

strategy for its efforts in support of ratification. The advice received was that a move by BPW, in conjunction with other national organizations, to cancel its national convention, scheduled for a state which had not ratified the ERA (Nevada), might be a powerful tool to influence legislators' votes on ratification. Also in April, 1975, the National Association of Women Deans, Administrators and Counselors adopted a resolution not to convene in unratified states. In May, 1975, the League of Women Voters adopted its resolution to urge the national political parties not to hold conventions in unratified states. Both BPW and the National Education Association took action in July, 1975, and resolved not to hold conventions in unratified states. The American Association of University Women passed its resolution in November, 1975. In September, 1976, the American Political Science Association adopted a similar resolution not to convene in unratified states. There is no evidence that any of these groups were contacted or influenced in any way by NOW. Some groups took this action believing that the convention boycott was an original idea. Others were aware that a convention boycott resolution had been adopted by another group or groups at an earlier time. Some groups made no effort to influence others to adopt boycott resolutions; some took active steps to communicate their decisions and to urge similar action by other groups.

The national NOW organization did not become involved with this movement until 1977. In January of that year, Eleanor Smeal, the current president of NOW, was in Nevada taking part in an effort to secure ratification of the ERA in the Nevada legislature. As a part of that effort, the League of Women Voters and the California state NOW organization sponsored an advertisement in the *San Francisco Chronicle*, a newspaper read by Nevada legislators, urging California residents to refrain from traveling to Nevada until that state ratified the ERA. From the reactions of the Nevada Governor and legislators to the advertisement, it was determined that the potential of such a boycott as long as a state remained unratified could have an effect on legislators' votes.

The then-president of NOW made telephone calls to members of several national organizations asking if any might be in a position to adopt and publicize a boycott resolution aimed at the state of Nevada in an effort to influence the upcoming vote on the ERA in the Nevada legislature. She discovered that it was difficult to secure immediate decisions due to the requirements of the formal decision-making processes in each group. As a result, before the Nevada legislature voted on the ERA, there was little activity of substance undertaken by NOW that was directed at a convention boycott of Nevada or other unratified states. The evidence shows that NOW officials were then of the impression that the convention boycott was an original idea and were unaware that some organizations had adopted boycott resolutions as much as one and one-half years earlier.

NOW adopted its own convention boycott resolution in February, 1977. At that February meeting, NOW decided to pursue a centralized convention boycott strategy. A committee was appointed to implement the new national strategy, but there is no evidence that much, if anything, was done in that regard during the first six months of 1977. NOW officers did complete studies of the legislative and political situation in each of the fifteen unratified states. Many organizations adopted convention boycott resolutions during the first half of 1977, but there is little evidence that NOW was actively soliciting such actions or coordinating a centralized convention boycott campaign during that period.

Dr. Frances Kolb was appointed to chair NOW's reconstituted Economic Sanctions Committee in July, 1977, after which NOW's role in furthering the convention boycott movement increased significantly. A paid staff person was retained by NOW in August, 1977, to work on the boycott campaign, among other things. Although there is evidence that much of the time of the individuals in question was expended to prepare for NOW's role in the International

Women's Year meeting in Houston in November, 1977, NOW's active role in the convention boycott campaign began that summer.

As the parties have stipulated, from that time until the trial of this case in October-November, 1978, NOW actively engaged in an "economic boycott campaign" that has been a significant part of and shared common goals with a larger convention boycott movement directed at unratified states. The stipulated goal of NOW's economic boycott campaign and the end of all of NOW's activities relevant to this action is the ratification of the Equal Rights Amendment.

There are many facets to NOW's campaign. NOW set up a committee on the national level to centrally coordinate the convention boycott movement. For at least some period of time, NOW retained a full-time staff person to work on the boycott campaign. NOW sent a letter urging the adoption of a convention boycott resolution to hundreds of organizations and arranged for follow-up telephone contacts. NOW arranged for the printing and distribution of a boycott brochure [3] which urges individuals to join the boycott campaign by working for a boycott resolution within their own organizations. This brochure incorporated a business reply card with which interested individuals could request further information on the boycott campaign. NOW also arranged for the manufacture of a campaign-style button identifying the wearer as a supporter of the convention boycott of unratified states.

NOW maintains an office in Washington, D. C., in which the mentioned boycott campaign work was done. The office served as a "clearinghouse" for information on the boycott. Individuals and groups were actively solicited to contact the NOW office for information and materials. For a period of time, NOW maintained a "Countdown House," utilizing a nationwide telephone campaign, in order to contact its local chapters concerning boycott activities and other projects. NOW officials and staff put together a "boycott kit" which was made available to individuals on request. In addition, this kit was sent to NOW members across the country who were taking leadership roles in local NOW activities. The kit contained various materials for use by individuals desiring to promote the boycott.[4] NOW also prepared and distributed material suggesting that local governments be approached and urged to adopt boycott resolutions imposing limits on official travel to unratified states. This material contained tactical suggestions, including a sample resolution, whereby city and county legislators could be approached to solicit support for a boycott resolution. Materials provided to members of local NOW chapters also included tactical pointers for local boycott activities. Local chapters were urged to take an "inventory" of the organizational memberships of chapter members in order that local members could request boycott action of other organizations as members of those organizations and not as members of NOW.

Much of the boycott work carried on at NOW's Washington, D. C., office concerned NOW's effort to gather statistics on the boycott. NOW attempted to maintain an up-to-date list of organizations which had adopted a boycott resolution. It appears that maintenance of an accurate list was not a simple undertaking. The list required constant updating and checking for accuracy. Some of the information concerning

3. There were two printings of 20,000 copies each. Several thousand brochures were distributed at the International Women's Year Conference in Houston, Texas, in November, 1977. The small fraction of NOW's 1977 budget ($5,000) earmarked for the economic boycott campaign went mainly for printing expenses.

4. The kit contained the brochure and button described above, a list of the members of the national committee with their telephone numbers, a "guidelines for action" paper, a current list of organizations which had adopted a convention boycott resolution, a "position paper," a "boycott fact sheet," a list of convention changes, and a "contact sheet" listing the names and addresses of legislative leaders in unratified states. The boycott kit was not being distributed at time of trial because NOW officials found it to be prohibitively expensive.

boycott resolutions was provided to NOW as a result of NOW inquiries and general solicitation of information about the boycott; some was provided by groups or individuals on a completely voluntary basis. NOW took steps to ensure that the list of organizations was accurate. Procedures were adopted which required notification from an official of an organization and provided for subsequent telephone verification that an official action had been taken by a particular group. In addition to the list of organizations, NOW devised a statistical questionnaire which requested information on group size, convention attendance, and potential economic impact in terms of revenue loss due to a convention cancellation or site change.

NOW made a series of direct, personal contacts with many groups. Some of these personal contacts were part of specific assignments to NOW officials. Some of the contacts were more general in nature, consisting of telephone calls, letters, speeches, and personal appearances of NOW officials or members. Some personal contacts were directed specifically to the adoption of a boycott resolution; some were generally directed at generating support for the ERA, without specific mention of the boycott. NOW also made a concerted effort to generate media interest in the ratification effort generally and the convention boycott specifically. NOW officers arranged for press conferences, provided press releases to media, submitted to interviews, and made many personal appearances. NOW also included stories on the boycott in its internal publication, the *National NOW Times,* urging participation in boycott projects by local members. The attainment of extensive press coverage for NOW's boycott efforts was a critical part of the economic boycott campaign.

There is evidence that several of NOW's local chapters and individual NOW members carried out boycott projects of their own, in particular, active efforts to secure adoption of boycott resolutions by local governments. Although there is ample evidence to support a finding that NOW actively encouraged and aided such projects with materials and information, the parties have stipulated that NOW has no control or supervision over its local chapters, and that the local chapters are independent and autonomous and do not act as agents of NOW.

Although NOW's economic boycott campaign is a significant part of a larger convention boycott movement, it does not occupy the field. ERAmerica, a coalition of many pro-ERA groups, was formed as a neutral umbrella-type organization to provide leadership and coordination to the ERA ratification effort. Represented on the board of directors of ERAmerica are groups such as the National Education Association, the National Federation of Business and Professional Women, the National Womens' Political Caucus, the League of Women Voters, and the Coalition of Labor Union Women. ERAmerica has engaged in many of the same activities in support of the convention boycott as has NOW, including writing letters to organizations urging convention site changes away from unratified states, offering sample boycott resolutions, and keeping lists of organizations which have adopted such resolutions.[5] There is evidence that NOW and ERAmerica exchanged information on a staff level relating to corrections in their respective lists of boycotting organizations; however, there is nothing to indicate that the two groups made any effort to coordinate their activities in support of the convention boycott. ERAmerica recognized NOW's organizational role in the boycott movement, but has pursued an essentially independent, though somewhat parallel, course of action.

There is evidence of at least one completely independent effort in support of the boycott movement. Several professional historians conducted their own campaign to influence historical associations to which

5. On February 8, 1977, ERAmerica released a list of 15 national organizations which had adopted boycott resolutions, erroneously including the National Organization for Women.

This list reflects activity in the convention boycott movement long before NOW took any part.

they belonged. This campaign involved letter writing and the organization of a petition drive among association members, all at the personal expense of the individuals. There is no evidence that this individual campaign was a result of solicitation by or a combination or agreement with NOW or anyone else.[6]

It is evident that even though NOW came to occupy what is perhaps the leadership role in the convention boycott movement, it was and still is one actor among many. The circumstances surrounding each convention cancellation in Missouri and the adoption of each convention boycott resolution are as varied as the number of organizations involved. Missouri alleges that these decisions were made "at the express urging" and "in combination with" NOW. In fact, NOW's influence in the decisions varied greatly. As discussed above, there were several large groups which made boycott decisions far in advance of the inception of NOW's economic boycott campaign, and which could not have been influenced in any way by NOW. On the other hand, there are groups which were the objects of direct and active solicitation by NOW, including letters, personal contacts, speeches, and telephone calls. In these situations, active solicitation by NOW was followed by a boycott decision.[7]

There are other cases in which NOW's contacts with particular groups were of varying degree. Some groups adopting boycott resolutions were the recipients of a single letter as a part of a NOW mass mailing. Some groups were actively solicited by local NOW chapters, but had no contact whatever with NOW. Some groups were not contacted at all, but were influenced indirectly by NOW through the publicity surrounding the boycott movement and NOW's campaign.[8] Resolutions adopted by some groups expressly refer to NOW or the "NOW boycott." It is clear that some were influenced by the number and type of organizations which had previously adopted resolutions. This lends importance to the influence of NOW's list of boycotting organizations and its broad publication.

The parties have stipulated that the goal of NOW's convention boycott campaign is the ratification of the ERA. A careful review of the entire record in this case confirms that no contrary finding is possible. The motivation of NOW and of the organizations involved in the boycott movement can be viewed from two points, both aimed directly at the legislative process. One reflects a desire of these groups to make a symbolic gesture. The evidence shows that the various decisions to encourage and to participate in the boycott were intended as demonstrations of support for ERA ratification. The affirmative step of a boycott resolution or convention cancellation, urged by NOW and taken by many organizations including NOW, was conceived to show strong support for a political issue, support of a nature beyond a simple expression of policy or preference. The other view of the intent behind the boycott movement concerns publicity. The public acts of these organizations were meant to attract attention and bring public visibility to the issue of ratification. This publicity was intended to engender discussion and lend an air of importance to the issue and to bring the question to a higher position among legislators' priorities. NOW and the other groups also intended that the adverse economic impact of the boycott on those who would otherwise profit from conventions in Missouri would cause those persons to influence their legislators to support ERA ratification. The record is convincing

6. On the contrary, the evidence shows that NOW did not even respond to correspondence from these individuals.

7. Groups in this category include the American Nurses Association (in relation to the convention of the International Congress of Nursing), the National Council of Senior Citizens, and the American Home Economics Association. However, there was evidence that many groups in this category were considering some sort of participation in the convention boycott movement before the initial contact from NOW.

8. The convention boycott movement was the subject of a front page article in the *New York Times* on November 13, 1977.

that the above-described actions were not intended as punitive, in the sense that the boycott was not intended to punish Missouri for its past failure to ratify but to promote ratification in the future, and were not motivated by any type of anticompetitive purpose.

NOW argues that the evidence is not sufficient to sustain a finding of combination or conspiracy within the meaning of § 1 of the Sherman Act. Assuming, *arguendo,* that the above-described actions taken by NOW fall within the purview of the Sherman Act, there is sufficient evidence to justify a finding that NOW entered into a combination to implement a convention boycott of unratified states. It is clear that at least some of the decisions to boycott convention facilities of unratified states were taken in direct response to NOW's advocacy. In addition, the invitation to act, the presence of a strong motive for concerted action, and the knowledge that others were taking similar action are sufficient to find conspiracy under the Sherman Act. *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).[9]

## II. *Standing*[10]

The State of Missouri asserts that it has standing to bring this action for injunctive relief as "*parens patriae,* trustee, guardian and representative of its citizens and the economy of the State." [11]

The Supreme Court has settled that a state does have standing to sue under the antitrust laws to protect its quasi-sovereign interest in the well-being of its general economy and the welfare of its citizens. *Georgia v. Pennsylvania R. R.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). This question of standing was reviewed in *Hawaii v. Standard Oil,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), in which the Court held that Hawaii, as *parens patriae,* could not recover damages for an injury to its economy under § 4 of the Clayton Act, 15 U.S.C. § 15. However, state standing to obtain injunctive relief to remedy an injury to its economy was effectually reaffirmed when the Court distinguished as "notably different" § 4, which requires injury to "business or property" in order to recover damages, and § 16 of the Clayton Act, 15 U.S.C. § 26, which authorizes injunctive relief upon a showing of "threatened loss or damage." [12] Missouri brings this action under § 16.

At the pleading stage of this case, Missouri alleged substantial injury to the "economy and prosperity" of the state, which included financial loss suffered by convention and tourist-related businesses and diminished tax revenues for the state and local governments as a result of the lower level of economic activity within the state. The evidence revealed that more than ten major conventions definitely booked [13] into Missouri cities have been cancelled as a result of the boycott movement.[14] These cancellations represent a

9. It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.

*Interstate Circuit, Inc. v. United States, supra,* at 226, 59 S.Ct. at 474.

10. Because this substantial legal issue, raised in NOW's motion for summary judgment, was interposed so close to time of trial, this Court deferred its ruling until after the trial on the merits.

11. It is unnecessary to reach other grounds for standing asserted by Missouri.

12. In holding that damage to a state's general economy is not an injury to its "business and property" necessary for recovery of damages under § 4, the Court contrasted the potential of multiple recoveries inherent to a *parens patriae* damage claim with the unitary effect of an injunction.

13. In the parlance of the convention industry, a definite booking is the confirmation, probably in writing, of the official decision of the organization to designate a certain city or particular facilities for its meeting.

14. At least one of these cancellations, occurring in 1976, predated NOW's active role in the boycott campaign.

very approximate revenue loss of at least $8.6 million to Missouri hotels, restaurants and numerous other businesses catering to the convention trade. Although no revenue loss estimate was available, at least six smaller conventions, also definitely booked into Missouri hotels, have been moved to facilities in other states. A substantial amount of tentative convention business, perhaps exceeding the dollar volume of cancelled definite bookings, has also been moved to locations outside of Missouri.[15] It is difficult to produce accurate estimates of revenue loss due to these cancellations because some of the conventions were scheduled to occur two or more years in the future. Obviously, the sales personnel in the convention and visitors bureaus and the affected hotels are and will be making efforts to rebook the previously reserved space with other conventions. There is evidence that some amount of such rebooking has taken place, which would reduce any estimate of revenue loss by the volume of the substituted business. The revenue loss equation, however, must include the consideration that most national conventions are booked from three to five years in advance, some as far as ten years in advance. It is difficult, therefore, to rebook a large block of space with another large convention, if given only one or two year's notice from the time of cancellation.

The lead time requirement for most national conventions adds an additional factor to the estimation of injury. Although Missouri businesses catering to conventions have already been harmed in some degree due to cancellations of definite convention bookings, the evidence shows that the impact of the convention boycott may be felt to a greater extent some years in the future. Decisions being made currently concern site selection for conventions to be held five or ten years in the future. At least the larger organizations have a limited time frame in which advance bookings can be made and once that time is past, the potential business is lost because an alternative site will have been selected. There may be no additional cancellations of definite bookings, but the refusal of the large number of boycotting groups to even *consider* a Missouri convention site poses an undeniable threat of injury in the future.

The estimate of revenue loss due to the convention boycott published by NOW in January, 1978, listed revenue loss to St. Louis of $11 million and revenue loss to Kansas City of $8 million.[16] The NOW list of boycotting organizations dated October 17, 1978, contains 273 organizations and independent decision-making components thereof and 34 city and county governments.

NOW argues that Missouri lacks standing as *parens patriae* because the state seeks to represent the interests of a single industry, which is quite small in relation to Missouri's total economy,[17] and which is capable of action in its own behalf to protect individual interests.[18] NOW categorizes this case as one in which the interests of particular individuals are paramount, rather than one in which the interests of all the citizens of the State of Missouri are adversely affected,

15. A tentative booking is notification from the organization that it is interested in particular facilities and constitutes a request that the space be reserved on a tentative basis pending an official decision. At this stage, the organization may tentatively book several locations, with the result that every tentative booking does not become a definite booking.

16. NOW's estimate represents revenue loss over the period 1978–1981 and does not include revenue loss resulting from the cancellation of the 1981 International Congress of Nursing convention in Kansas City, Missouri. That convention is estimated to represent $3.2 million revenue to the convention site.

17. It is NOW's position that whatever injury has been proved is insignificant if compared with the dollar volume of all economic activity within the state of Missouri. In 1977, the convention industry brought $183 million in revenue to the state. Total personal income in Missouri in 1977 was in the neighborhood of $25 billion.

18. *See Action Committee for Tourism, Inc. v. National Organization for Women, Inc.,* Civil Action No. 78–1510 (E.D.La., filed May 6, 1978) (suit with issues common to this case brought by private interests).

citing *Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health,* 160 F.Supp. 387 (E.D.La.1958). In that case, several Minnesota manufacturers of dried milk sued to overturn Louisiana milk labeling provisions. The Attorney General of Minnesota described the dairy industry as one which involves "a major economic activity of importance to the people of Minnesota" and sought leave to intervene as *parens patriae* on behalf of all Minnesota dried milk producers not already party to the suit. The court denied the state's motion to intervene, taking judicial notice that the dairy industry was neither the only nor the largest industry in Minnesota.

> The dairy industry statistics offered by Minnesota fail to demonstrate that the sale of dried milk is of such pervasive importance to that industry and to Minnesota citizens generally that restrictions on the interstate distribution of dried milk would directly and materially affect the "welfare of the people of Minnesota." Thus the interests of the single industry here involved must be held to be private interests, not interests affecting the whole economy or all of the people of the state. This type of interest is insufficient to give Minnesota the right to sue as *parens patriae* in behalf of all, or a substantial number of her citizens. *Id.* at 389.

It is NOW's argument that the facts before this Court are analogous to those in *Land O'Lakes Creameries;* that Missouri's suit is for the benefit of individual interests rather than for the benefit of all the people of the state and that therefore the state lacks standing as *parens patriae.*[19]

Over NOW's strong relevancy objection, Missouri offered the testimony of an expert economist to illustrate (1) that the injury resulting from the boycott is not confined to a narrowly defined convention industry, but cuts across the entire economy of the state, and (2) that the magnitude of the injury to the general economy is much greater than the figures contained in the estimates of revenue loss to convention businesses. The economy of a political region, such as the State of Missouri, has been divided by economists into various sectors for the purpose of analysis.[20] The economic units (businesses and individuals) that make up each sector produce output which is exchanged with other sectors to obtain necessary inputs. These economic linkages between and among the various sectors are a primary cause of the interdependence which characterizes the complex state of a modern economy. There is evidence that the dollars spent by the average convention delegate flow fairly directly into thirteen sectors of the economy of the convention site.[21] However, the linkages between the sectors receiving convention dollars and other sectors operate to move that money through all the sectors, with the result that dollars spent by convention delegates affect *every* sector in the economy of the convention site. As convention dollars move through the economy, each turnover between sectors generates new dollars of business income in a phenomenon known as the "multiplier effect." Economists have calculated multiplier figures that measure the flow of dollars into the economy and the successive turnover of those dollars into new business income until the identifiable dollars finally disappear. Using multiplier figures for the Missouri economy, it has been calculated that every dollar spent by people attending

19. *See Oklahoma v. Atchison, T. & S. F. Ry.,* 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911); *Kansas v. United States,* 204 U.S. 331, 27 S.Ct. 388, 51 L.Ed. 510 (1907).

20. *E. g.,* livestock, textiles and apparel, primary metals, household appliances, heavy construction contractors, etc. There are over 50 such sectors.

21. Sectors receiving convention dollars are hotels, eating and drinking places, meat processing, dairy products, grain mill products, other food products, gasoline service stations, other retail businesses, miscellaneous manufacturing, transportation services, other services, wholesale businesses, and imports. International Association of Convention and Visitors Bureaus, *Convention Delegate Expenditure Survey* 1973 (sector classifications were modified to comport with the analytical model of Missouri's expert witness).

conventions in Missouri generates $2.78 in spending throughout the economy of the State of Missouri.

Missouri thus argues that, as convention spending affects all sectors of the economy, the withdrawal of convention dollars from Missouri has an adverse effect on *all* sectors of Missouri's economy. Missouri also urges consideration of the economic *effect* of the withdrawal of convention dollars, after application of the multiplier figure. Missouri maintains that the thus broadened base of incidence of injury (every economic sector affected) coupled with a consideration of the magnitude of its economic *effect* (post-multiplier) is sufficient to constitute an injury to the "general economy" of the state. The state, says Missouri, should have standing as *parens patriae* to remedy such injury.

The question thus presented to this Court is whether an economic injury of the type and extent as has been proved by the State of Missouri is sufficient to confer upon it standing as *parens patriae.* It is a question not likely to produce an easy answer. The District of Columbia Circuit considered the problem in *Pennsylvania v. Kleppe,* 174 U.S.App.D.C. 441, 447–48, 533 F.2d 668, 674–75, *cert. denied sub nom. Pennsylvania v. Kobelinski,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976).

> The nature of the economic or welfare interest necessary to justify state standing is one of the more obscure issues with which we must deal. The valid though largely unhelpful generality which guides us is that the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens. However, in view of the substantial interrelationship of all economic activity, no clear demarcation is possible between individualized harms and injury to the economy as a whole. This appears to be one area where the sufficiency of the injury actually alleged is highly contingent upon other relevant factors bearing on the appropriateness of letting the plaintiff state pursue the case on the merits.
>
> At one extreme, it is entirely clear that a state never has standing on the basis of personal claims assigned to it by individuals. It also seems well established that there can be no standing in the state where the primary thrust of an alleged wrong is injury to a narrowly limited class of individuals, and the harm to the economy as a whole is insignificant by comparison. However, in some cases, it has been held sufficient that the direct impact of the alleged wrong be felt by a substantial majority, though less than all, of the state's citizens, so that the suit can be said to be for the benefit of the public. And even where the most direct injury is to a fairly narrow class of persons, there is precedent for finding state standing on the basis of substantial generalized economic effects.
>
> It thus appears that injury to the state's economy or the health and welfare of its citizens, if sufficiently severe and generalized, can give rise to a quasi-sovereign interest in relief as will justify a representative action by the state. *The cases indicate not only that the nature and degree of essential harm cannot be characterized with any precision, but that factors other than the degree of injury are influential in determining state standing.* . . . [I]t *also appears that the sufficiency of the state interest asserted may sometimes be influenced by policy concerns arising from the context of the suit quite apart from the injury itself.* (emphasis added)

This Court is convinced that *parens* standing is not foreclosed simply because the most direct injury is suffered by a rather narrow class of individuals. NOW argues that the businesses that have been injured are capable of bringing suit to protect their individual interests and thus there is no justification for intervention by the state as *parens patriae,* citing *Oklahoma v. Atchison, Topeka & Santa Fe Ry.,* 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911). In *Burch v. Goodyear Tire Co.,* 420 F.Supp. 82 (D.Md.1976), *aff'd,* 544 F.2d 633 (4th Cir. 1977), the Attorney General of Maryland

brought suit for injunctive relief under § 16 of the Clayton Act. It was alleged that Goodyear and Cities Service Oil Company had combined to restrain competition among tire manufacturers and foreclose competition in the tire replacement market, which consisted of individual Cities Service service station dealers. Goodyear argued that the suit was for the benefit of the individual service station dealers and that therefore the state lacked standing as *parens.* The district court, later affirmed by the Fourth Circuit, rejected that argument and distinguished *Oklahoma v. Atchison, Topeka & Santa Fe Ry., supra,* as it involved a direct monetary benefit to the "individual" being represented by the state. The district court in *Burch* noted that there was no claim by Goodyear that the individual service station dealers would receive any monetary gain as a result of the suit and held that the state did have standing to sue.

> Any suit by a state on behalf of its citizens as a whole will benefit some of its citizens more than others. . . . The premise of the antitrust laws is that an anticompetitive injury felt acutely by a few is also an injury to the commonweal. The fact that some will benefit more than others is not a barrier to maintenance of this lawsuit. *Burch v. Goodyear Tire & Rubber Co., supra,* at 89.

The facts in *Burch* are analogous to this case inasmuch as there is no claim by NOW that any of the businesses that make up the convention industry in Missouri will receive any monetary benefit as a result of this lawsuit.

■ As a part of the reasoning process to determine whether a state will be recognized to have standing as *parens patriae,* courts have had the occasion to consider factors other than the type and extent of injury involved. In *Pennsylvania v. Kleppe,* quoted *supra,* the court referred to and considered "policy concerns arising from the context of the suit quite apart from the injury itself." NOW cites *Land O'Lakes Creameries,* in which the court found the interests involved to be private and denied state standing as *parens patriae.* However, removed from its analysis of the *type of injury* alleged, the district court in that case noted that it considered "the advisability of allowing the Attorney General of Minnesota to range at large in courts of other states, and of the United States, seeking to have declared unconstitutional laws passed by the legislatures of those states." *Id.* at 390. Indeed, the issue of *parens patriae* standing has been most often litigated in the context of an assertion of the original and nonexclusive jurisdiction of the Supreme Court. It is undeniable that such cases "do not present an isolated question" and may "involve the concern to shepard the scarce time and resources of that tribunal." *Pennsylvania v. Kleppe, supra,* 174 U.S.App.D.C. at 447 n.36, 533 F.2d, at 674 n.36. *See, e. g., Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976). This court has found that the businesses of Missouri's convention industry have suffered economic injury as a result of the boycott and are threatened with additional injury in the future. Although the dollar volume of that injury is a small relative proportion of the entire Missouri economy, the injury is not insubstantial in the absolute. The adverse effect of the injury extends to all parts of the economy of the state. After having considered the nature and the extent of the injury to the economy of Missouri, this Court is compelled to turn to the additional factors and policy concerns mentioned in *Pennsylvania v. Kleppe* and *Land O'Lakes Creameries, supra.*

It has been remarked that this case has no precedent; that it presents a unique set of circumstances not before determined in any other court. That fact weighs as heavily in that balance on the issue of standing as it does on the merits. The parties stipulate that the aim of the boycott is to secure ratification of the Equal Rights Amendment. All of the boycott activity undertaken by NOW insofar as it has affected the State of Missouri, has been directed toward securing an act of the Missouri General Assembly. NOW's target, if such a word can be used, is the state legislature,

the supreme policy-making body of the state. The State of Missouri as a political entity is as much a part of the underlying controversy as is Missouri a formal party to the lawsuit. In this unique set of circumstances, after giving full consideration to the type and extent of general economic injury suffered, this Court is drawn to the conclusion that it is appropriate that the State of Missouri have standing as *parens patriae* to pursue this matter on the merits and seek injunctive relief under the antitrust laws. The Court is of the opinion that this is not a case "in which the state is gratuitously attempting to prosecute purely personal claims of its citizens, . . . but rather is one in which the state is seeking to protect the public interest." *Kelley v. Carr,* 442 F.Supp. 346, 357 (W.D. Mich.1977).

It must be noted that this conclusion is the result of a consideration of the economic and policy factors in this case. This opinion is not to be read as a general approval of *parens patriae* standing as a matter of law in any case in which the state adduces expert testimony to show generalized economic injury due to linkage or interdependence among the various sectors of the state's economy.[22]

### III. *Antitrust Claims*

"Boycott" has been defined as "a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *St. Paul Fire & Marine Insurance Co. v. Barry,* 438 U.S. 531, 541, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978). From the very beginning of antitrust enforcement, the boycott or concerted refusal to deal has been held to be a combination in restraint of trade, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. *E. g., Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild v. F.T.C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Association v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Missouri contends that the convention boycott fostered by NOW is a combination in restraint of trade and as such violates the Sherman Act.[23]

It is NOW's position that the antitrust laws simply do not apply to the convention boycott because of its "noncommercial" nature.[24] "[T]he Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives." *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 213 n.7, 79 S.Ct. at 710 n.7. NOW argues that the convention boycott takes place in a political, rather than business, context and thus is outside the scope of the Sherman Act,[25] which was intended

**22.** NOW argues that "[a]cceptance of the state's theory [of economic linkage causing damage to the general economy] would give the state standing to sue in every case where any Missouri business claims injury by reason of any tort, including violations of antitrust laws, or presumably even in ordinary breach of contract cases." Defendant's post-trial brief, at 10. The Court shares this concern and notes that the economic interdependence rationale for *parens patriae* standing cannot be viewed in isolation or accepted as the sole justification for state standing. To do so would carry the doctrine of *parens patriae* far beyond its proper bounds.

**23.** Missouri further argues that withholding patronage from Missouri convention businesses in order to influence the Missouri legislature constitutes a secondary boycott, *i. e.,* economic pressure on innocent third parties to achieve some result with respect to the boycott target, and therefore is *per se* unlawful under the Sherman Act. *See Klor's, Inc. v. Broadway-Hale Stores, Inc., supra; Fashion Originators' Guild v. F.T.C., supra.*

**24.** *See Apex Hosiery Co. v. Leader,* 310 U.S. 469, 493 n.5, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) (Sherman Act intended to control problems of "business competition").

**25.** Missouri cites cases for the proposition that the Sherman Act does apply to "non-traditional" boycotts, the ultimate focus of which is an objective other than the business or commercial advancement of the participants. *American Medical Assoc. v. United States,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) (exclusion from hospital facilities of doctors on salary with prepaid group health plan); *Hennessey v. National Collegiate Athletic Assoc.,* 564 F.2d

to concern "commercial enterprises, competing in particular markets, arguing over issues which will determine the commercial success and profitability of one or the other of the parties to the dispute." *Council for Employment and Economic Energy Use v. WHDH Corp.*, 580 F.2d 9, 12 (1st Cir.), *petition for cert. filed,* 47 U.S.L.W. 3228 (U.S. Sept. 21, 1978) (No. 78–486).

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court considered the scope of the Sherman Act in a political context. In that case, the railroads conducted a publicity campaign designed to promote stricter government regulation of the trucking industry. The campaign, utilizing methods characterized as unethical, was motivated by a purely anticompetitive purpose. Citing *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 317 U.S. 341 (1943), the Court reiterated that a restraint of trade resulting from a valid government action could not be the basis of a Sherman Act violation and stated:

> We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly. Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of "combination[s] . . . in restraint of trade," they bear little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements. This essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act, even if not itself conclusive on the question of the applicability of the Act, does constitute a warning against treating defendants' conduct as though it amounted to a common-law trade restraint. And we do think that the question is conclusively settled, against the application of the Act, when this factor of essential dissimilarity is considered along with the other difficulties that would be presented by a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws.
>
> In the first place, such a holding would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. *To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act. Secondly, and of at least*

1136 (5th Cir. 1977) (application of Sherman Act to regulation of non-profit educational association limiting the number of assistant football coaches of member institutions); *Council of Defense v. International Magazine Co.*, 267 F. 390 (8th Cir. 1920) (boycott of Hearst publications organized by officially-supported state organization); *Tondas v. Amateur Hockey Assoc.*, 438 F.Supp. 310 (W.D.N.Y.1977) (non-profit athletic association); *Tropic Film Corp. v. Paramount Pictures Corp.*, 319 F.Supp. 1247 (S.D.N.Y.1970) (film rating program); *American Brands, Inc. v. National Assoc. of Broadcasters,* 308 F.Supp. 1166 (D.D.C.1969) (guidelines prohibiting advertising of "low tar" cigarettes). *But cf. Marjorie Webster Junior College, Inc. v. Middle States Assoc. of Colleges and Secondary Schools, Inc.*, 139 U.S.App.D.C. 217, 432 F.2d 650, *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970).

> *equal significance, such a construction of the Sherman Act would raise important constitutional questions.* The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms. Indeed, such an imputation would be particularly unjustified in this case in view of all the countervailing considerations enumerated above. For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws. *Id.,* 365 U.S. at 136–38, 81 S.Ct. at 529–530. (emphasis added)

The Court found that the anticompetitive purpose underlying the railroads' campaign was irrelevant, in that the right of the people to inform their representatives could not depend upon their intent in so acting. The unethical and misleading methods employed by the railroads also were found not to be a basis for Sherman Act liability.

> Insofar as the Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical. *Id.* at 140–41, 81 S.Ct. at 531.

Missouri's analysis would limit the Court's holding in *Noerr* to its facts and distinguish that case from this. The convention boycott fostered by NOW, it is argued, is the very antithesis of the activity protected in *Noerr.* The Court in *Noerr* found that concerted activity to influence the legislature to adopt a law which would result in a restraint of trade was not a Sherman Act violation. The restraint of trade in *Noerr* was the result of a valid legislative act, already held nonviolative of the Sherman Act in *Parker v. Brown, supra.* On the contrary, says Missouri, the restraint of trade in this case is a direct result of the concerted action undertaken by NOW and the boycott participants; the harm results from the combination, and not from the legislative act which is the boycott's ultimate goal. Missouri states that NOW's actions have gone far beyond the "mere solicitation of government action" in *Noerr, supra,* and are therefore not within the *Noerr* "exclusion" from antitrust coverage.

Missouri's conclusion of antitrust liability is based on the presumption against implied exclusions from the Sherman Act. In *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court referred to the "overarching and fundamental" policies represented in the antitrust laws which argue against implied exclusions. The Court noted that two policies have been held sufficiently weighty to overcome this presumption: the *Parker v. Brown* "state action" exclusion, and the *Noerr* "political" exclusion, concerted action to influence lawmakers. The Court found common to both of these exclusions a potential conflict between the Sherman Act and " 'polic[ies] of signal importance in our national traditions and governmental structure of federalism.' " However, the Court did remark that even these exclusions would not prevent antitrust enforcement unless it was thought to "severely impinge" upon the fundamental policies underlying the exclusions.

Missouri argues specifically against a general "first amendment exclusion" from Sherman Act coverage. In *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), the Supreme Court held that the first amendment does not protect speech or writing used as an integral part of conduct in violation of a

valid criminal statute. Missouri cites cases applying this principle to Sherman Act enforcement. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945). These cases hold that conduct found to be in violation of the Sherman Act is not immunized from antitrust liability simply because it involves some element of speech. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' . . . ." *California Motor Transport Co. v. Trucking Unlimited, supra,* 404 U.S. at 515, 92 S.Ct. at 614. However, they do not touch the issue in this case, which is whether NOW's actions, which are themselves an exercise of first amendment rights, constitute a violation of the Sherman Act.[26]

The activities of the railroads complained of in *Noerr, supra,* were undertaken in what was essentially a commercial context. The parties and the industries they represented were in a competitive relationship. It was clear that the sole motivation behind the railroads' actions was to destroy that competition. Although such a commercial setting is the context in which the antitrust laws were intended to operate, the Supreme Court found that the railroads' publicity campaign was not subject to the Sherman Act, as a contrary construction would hinder the communication vital to a representative government and raise important constitutional questions implicating the first amendment.

In contrast, the convention boycott complained of in this case takes place in what is essentially a political context. The parties have stipulated that the sole purpose of the boycott is ratification of an amendment of the Constitution. The participants are not moved by any anticompetitive purpose;[27] they are not in a competitive relationship. The boycott can be characterized as "non-commercial," in that its participants are not business interests and its purpose is not increased profits.[28] The boycott also can be termed "noneconomic"; it was not undertaken to advance the economic self-interest of the participants. The "essential dissimilarity" between the convention boycott directed at the legislatures of unratified states and agreements traditionally held violative of § 1 of the Sherman Act is of a greater magnitude in this case than that in *Noerr.*

Application of the Sherman Act to NOW's boycott campaign also would involve serious questions concerning the right of petition and the freedom of association protected by the first amendment.[29] In *Noerr* the Supreme Court "recognized a necessary limitation in order to resolve the conflict between the legislative intent to foster competition and the fundamental precepts embodied in the First Amendment which protect legitimate attempts to influence the operation of the executive and

26. *Council of Defense v. International Magazine Co.,* 267 F. 390 (8th Cir. 1920), cited by Missouri, is not to the contrary. The Eighth Circuit found that a boycott of Hearst magazines organized by a state-supported organization was a violation of the Sherman Act. The court stated: "Any contention that appellants were within their constitutional rights of free speech in saying, writing, and publishing the objectionable matter, is answered by *Gompers v. Buck Stove Co., supra.*" In *Gompers v. Buck Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911), the first amendment question raised was identical to that in *Giboney v. Empire Storage & Ice Co., supra,* in which the Court held that an otherwise illegal action is not protected simply because speech is used to advance the illegal activity. The first amendment protections for freedom of petition and of political association, which are implicit in this case, were neither presented to nor treated by the court in *Council of Defense.*

27. *See Miller & Son Paving, Inc. v. Wrightstown Township Civic Assoc.,* 443 F.Supp. 1268, 1272 (E.D.Pa.1978).

28. *See* Coons, *Non-commercial Purpose as a Sherman Act Defense,* 56 Nw.L.Rev. 705 (1962); Bird, *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal,* 1970 Duke L.J. 247.

29. *See J. P. Stevens & Co., Inc. v. Jackson,* 99 L.R.R.M. 2827 (N.D.Ga.1978). *See also Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d

legislative process." *Bethlehem Plaza v. Campbell,* 403 F.Supp. 966, 969 (E.D.Pa. 1975).[30] The Supreme Court's reasons for nonapplication of the antitrust laws in *Noerr* apply with greater weight to this case, which "involves political opponents, not commercial competitors; and political objectives, not market place goals.[31] For these reasons, this Court concludes that the Sherman Act does not apply to the actions of NOW in furtherance of its convention boycott campaign.[32] "There are areas of our economic and political life in which the precepts of antitrust must yield to other social values." [33] It is clear that this is such a case.[34] Likewise, the Missouri antitrust law, § 416.031.1, RSMo, does not apply to NOW's activities in furtherance of the boycott campaign.[35]

IV. *State Law Tort Claim*

Missouri alleges that NOW has intentionally inflicted economic harm upon the state without legal justification or excuse, and offers as authority § 766 of the *Restatement of Torts* (1939).[36] That section provides that the unprivileged inducement of third parties not to engage in business relations with another is tortious. Missouri courts have stated that the unjustified interference with reasonable expectancies of commercial relations is an actionable tort, citing § 766 of the *Restatement. Downey v. United Weatherproofing, Inc.,* 363 Mo. 852, 253 S.W.2d 976 (Mo.1953). The absence of justification, or existence of privilege, is an essential and required element of any such claim. *Cady v. Hartford Accident & Indemnity Co.,* 439 S.W.2d 483 (Mo.1969).[37] In this case economic pressure is being utilized in a good faith effort to influence the ratification of an amendment to the Constitution. In these circumstances, the interest sought to be advanced by NOW and especially the constitutional interests involved in protecting NOW's ability to exercise its

231 (1960); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *Cf. NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963) (Of the NAACP, the Supreme Court said: "For such a group, association for litigation may be the most effective form of political association." *Id.* at 431, 83 S.Ct. at 337.).

30. *See also Mountain Grove Cemetery Assoc. v. Norwalk Vault Co.,* 428 F.Supp. 951 (D.Conn.1977).

31. *Council for Employment and Economic Energy Use v. WHDH Corp.,* 580 F.2d 9, 12 (1st Cir.), *petition for cert. filed,* 47 U.S.L.W. 3228 (U.S. Sept. 21, 1978) (No. 78–486).

32. This Court has considered and dismissed the theory advanced in Bird, *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal,* 1970 Duke L.J. 247, in which the author urges that noncommercial boycotts be treated as *per se* unlawful under the antitrust laws. The noncommercial boycott is seen as an "undesirable aggregation of private [economic] power" with no more than self-imposed restraints on harm caused to others. The author hypothesizes that such power could be wielded by zealous believers willing to impose economic harm upon their victims without limit until their noneconomic goal is achieved. This theory does not confront the first amendment guarantees of freedom of association and the right to petition which must be dealt with by the courts. This lack, coupled with the political realities of American government, makes it impossible for this Court to subscribe to it.

33. Handler, *Annual Review of Antitrust Developments,* 71 Yale L.J. 75, 88 (1961).

34. *See Mark Aero, Inc. v. Trans World Airlines, Inc.,* 580 F.2d 288 (8th Cir. 1978); *Metro Cable Co. v. CATV of Rockford, Inc.,* 375 F.Supp. 350 (N.D.Ill.1974), *aff'd,* 516 F.2d 220 (7th Cir. 1975); Kestenbaum, *The Antitrust Challenge to the Arab Boycott,* 54 Tex.L.Rev. 1411, 1423–24 (1976).

35. Section 416.141, RSMo, provides: "Sections 416.011 to 416.161 shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes."

36. Restatement of Torts § 766 provides:

> Except as stated in Section 698, [dealing with interference with a marriage contract] one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

Missouri cites no cases from its own courts on this issue.

37. Factors applicable to the determination of justification or privilege are set out in Restatement of Torts § 767 (1939):

right to petition and right to political association outweigh the interest in protecting the business expectancy involved.[38] If NOW's actions were not a legitimate effort to influence the legislature, this Court would be presented with a different case.[39] Under the particular facts of this case, the Court finds that NOW's convention boycott activities are privileged and therefore not actionable in tort under Missouri law.

Accordingly, the relief prayed for by the State of Missouri should be, and it is hereby, denied. In accordance with this opinion, judgment is to be entered for defendant.

IT IS SO ORDERED.

In determining whether there is a privilege to act in the manner stated in § 766, the following are important factors:

(a) the nature of the actor's conduct,

(b) the nature of the expectancy with which his conduct interferes,

(c) the relations between the parties,

(d) the interest sought to be advanced by the actor, and

(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand.

The discussion of privilege in the Restatement, including §§ 767 and 768, is referred to in *Downey v. United Weatherproofing, supra.*

38. *See Sierra Club v. Butz,* 349 F.Supp. 934 (N.D.Cal.1972) (recognition of privilege based on first amendment right of petition).

39. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("sham" exception); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 144, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).