Eleanor P. MARCHWINSKI and Margaret A. Samson, on behalf of themselves and on behalf of all other persons similarly situated, Plaintiffs,

v.

OLIVER TYRONE CORPORATION, Oliver Realty, Inc., Pittsburgh Buildings Association, on behalf of themselves and Oliver Tyrone Corporation, on behalf of all other persons similarly situated, and Building Service Employees' International Union, AFL-CIO, Pittsburgh Local # 29, Defendants.

Civ. A. No. 76–72.

United States District Court,
W. D. Pennsylvania.

Sept. 24, 1979.

Anita Meley Laing, Roslyn M. Litman, Howard A. Specter, Litman, Litman, Harris & Specter, Pittsburgh, Pa., for plaintiffs.

Daniel I. Booker, Robert W. Hartland, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Oliver Realty.

Herman L. Foreman, Rothman, Gordon, Foreman & Groudine, Pittsburgh, Pa., for Union.

Steven M. Olson, Thomas R. Johnson, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Oliver Tyrone Corp.

## OPINION

COHILL, District Judge.

### History of the Case

Today this Court issues its fourth opinion in one year in this complex employment discrimination litigation, filed in 1976 and still changing its shape and substance in the pretrial stages. *See Marchwinski v. Oliver Tyrone Corp.*, 461 F.Supp. 160 (W.D.Pa. 1978); *Marchwinski v. Oliver Tyrone Corp.*, 81 F.R.D. 487 (W.D.Pa.1979).

To review briefly: the named plaintiffs, two women employed as cleaning personnel and claiming to represent many others similarly situated, brought suit against the union that represents them, a real estate management company, an unincorporated association, and a business corporation, and attempted to join, through the mechanism of a defendant class, office building owners throughout the city who have employed members of the putative plaintiff class.

The original complaint was brought in five counts. Count one was brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; count two alleged violations of the fifth and fourteenth amendments to the United States Constitution and a conspiracy to deprive plaintiffs' rights in violation of the Civil Rights Act of 1861, 42 U.S.C. § 1985(3); count three charged a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15; count 4 alleged inadequate representation of plaintiffs by the union in violation of the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.*; count five, a pendent state claim, was grounded in the Pennsylvania Equal Pay Act, 43 P.S. § 336 *et seq.* Claims were asserted for declaratory, injunctive and monetary relief. The Court's role thus far, which we continue today, has been a process of weeding inappropriate claims and parties and pruning the litigation to a manageable size and shape. We first dismissed the constitutional allegations in count two as failing to state a claim, and dismissed the pendent state action as a discretionary matter. We also dismissed all claims against the unincorporated association for lack of proper service. At the same time we upheld the § 1985(3) claim as combined with a Title VII action, consistent with a then-new ruling of the Third Circuit, upheld the Labor Management Relations Act claim but only against the union, and refused to strike the demand for injunctive relief. (The antitrust count was not attacked by any of the defendants in the first round of motions to dismiss.) 461 F.Supp. 160–174. Later, we held that, while certification of a defendant class was not precluded as a matter of law, it would not be permitted on the Title VII claims since to do so would circumvent the administrative procedures integral to Title VII; therefore a defendant class would be possible only on the remaining civil rights and antitrust counts. 81 F.R.D. 487–490. We refused certification of that ruling under § 1292(b), and the last several months have been consumed by discovery which we had limited to class issues. During this time, the remaining three named defendants have filed a second round of motions to dismiss.

Today we decide (1) the continued vitality of the § 1985(3) claim in light of a recent United States Supreme Court decision, (2) whether a claim has been stated under the antitrust acts, (3) whether a defendant class may be certified, (4) whether a plaintiff class may be certified, and (5) the appropriate dimensions of a class action in this case.

### The § 1985(3) Claim

This claim is really no longer in dispute. In our earlier opinion we relied on the Third Circuit's ruling in *Novotny v. Great American Sav. & Loan Assn.*, 584 F.2d 1235 (3d Cir. 1978), a case constructed much like this one in that a § 1985(3) claim

had been joined with a Title VII sex discrimination allegation. The Third Circuit held that a § 1985(3) cause of action had been stated; however, that decision was recently reversed by the United States Supreme Court. *Great American Federal Sav. & Loan Assn. v. Novotny*, —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). The facts are so similar and the precedent so clear that plaintiffs acknowledge their § 1985(3) claim is no longer viable. Count two is therefore dismissed.

### The Antitrust Claim

Plaintiff's claim under the Sherman and Clayton Acts is more troublesome. This count alleges that the named defendants and other building owners combined and conspired to boycott women and to keep women in lower paying jobs. The defendants all move to dismiss this count, arguing (1) that plaintiffs' claim is simply not cognizable under the antitrust laws, and (2) that Title VII is the exclusive remedy for sex discrimination claims and therefore preempts an antitrust cause.

■ Joining an antitrust claim with a Title VII claim is a new weapon in the arsenal of class action plaintiffs' litigation.[1] The defendants have suggested that while the courts should not stifle such "creativity in the bar," they must remain true to the congressional purposes of Title VII and the antitrust laws. Those purposes are separate and distinct. Title VII was enacted specifically "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin . . ." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The purpose of the antitrust laws was to prevent restraints in business and commerce which tended "to restrict production, raise prices or otherwise control the market to the detriment of purchasers or consumers of goods and services, all of which had come to be regarded as a special form of public injury." *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). The two legislative schemes are obviously not co-extensive. We defer the question of whether they are mutually exclusive and focus on the defendants' first issue: have the plaintiffs in this case alleged an antitrust injury? In *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), the Supreme Court held that a plaintiff attempting to recover under the Sherman Act "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *See also United States v. E. I. Du Pont*, 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957).

■ Although we view the instant claim as somewhat novel, an attempt to use the antitrust laws to remedy non-antitrust ills is not new. In recent years, imaginative plaintiffs have sought to litigate environmental and political issues by invocation of antitrust claims. In *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976), a number of states and cities brought an action against automobile manufacturers and an automobile trade association alleging that the defendants conspired in restraint of trade to prevent development of antipollution technology. Affirming the district court's dismissal of the suit, the Court of Appeals for the Ninth Circuit noted,

> [I]n all of the cases to date, broad affirmative relief has been granted only where the threatened harm to be prevented is harm to the system which the

---

**1.** Defendants have brought to our attention only four cases similarly situated, as it were, all four brought by the attorneys representing the plaintiffs here, and the others filed subsequently to this action. *See Bandira v. United States Steel Corp.*, No. CA 78–990 (W.D.Pa., filed Sept. 6, 1978); *Butler v. United States Steel Corp.*, No. CA 78–1083 (W.D.Pa., filed Sept. 22, 1978); *Monk v. Island Creek Coal Co.*, No. 78–0258 (W.D.Va., filed Oct. 18, 1978). Our own research has uncovered one earlier case in which an antitrust claim was joined with an employment discrimination claim and in which the former was dismissed for failure to state a claim. *Taterka v. Wisconsin Telephone Co.*, 394 F.Supp. 862 (E.D.Wis.1975).

antitrust laws were designed to protect, the competitive market system.

538 F.2d at 236.

Likewise, a claim by the State of Missouri that a convention boycott of that state by the National Organization of Women and other groups constituted a combination and conspiracy in restraint of trade in violation of § 1 of the Sherman Act was rejected. In *State of Missouri v. NOW*, 467 F.Supp. 289 (W.D.Mo.1979), a district court entered a judgment for the defendant, accepting its argument that the antitrust laws are not applicable to a boycott for essentially political purposes. Although the boycott had an economic effect, the participants were "not moved by an anticompetitive purpose"; nor was the boycott "undertaken to advance the economic self-interest of the participants." 467 F.Supp. at 304. Although the *NOW* case involved important first amendment questions and public policies "vital to a representative government" not present here, 467 F.Supp. at 304, it is useful precedent to direct our attention again to the central issue: has it been alleged that the supposed conspirators are "commercial competitors" implementing unlawful "market place goals"? 467 F.Supp. at 305; *Council for Employment and Economic Energy Use v. WHDH Corp.*, 580 F.2d 9 (1st Cir. 1978); *Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

A third recent case had a goal similar to the instant lawsuit—the end of discrimination in employment. *NAACP v. New York Clearing House Assn.*, 431 F.Supp. 405 (S.D. N.Y.1977), was a class action brought against several commercial banks and a banking association alleging a Sherman Act conspiracy to refuse to contract with the City of New York so long as an affirmative action requirement was in effect. The complaint was dismissed for failure to state a claim under the antitrust laws. Judge Weinfeld explained:

> [B]y the allegations of the complaint itself the trade allegedly restrained is "interstate trade and commerce in specialized financial and data processing services for local governments." The plaintiffs are neither suppliers nor consumers of such financial services, but employees or prospective employees of the defendants.

Moreover, the injury plaintiffs will suffer is not "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." The Sherman and Clayton Acts were directed against conduct restraining trade or monopolistic practices. Under the allegations of the complaint, the claimed antitrust violations are illegal because they interfere with the natural flow of interstate commerce, tend to destroy free competition and lead towards monopolies. Plaintiffs themselves are not the victims of these claimed anticompetitive effects; they are not destroyed competitors or coerced consumers. Rather, their claim is of racial and sexual discrimination, presented in the guise of a Sherman Act violation. It is questionable whether Congress intended the antitrust statutes, with their treble damages provision, to impose liability for discrimination based on race or sex. That doubt is deepened when it is recognized that such discrimination can be redressed by various statutes specifically enacted to prevent it.

Finally, in a case very similar to this one, in which an antitrust claim was appended to a Title VII sex discrimination claim, a Virginia District Court has recently dismissed the antitrust claim. In *Monk v. Island Creek Coal Co.*, No. 78–0258 (W.D.Va. July 24, 1979), Judge Williams wrote that "[t]his court simply cannot believe that the antitrust laws were intended to prohibit sex discrimination, especially where Congress has enacted Title VII with its extensive administrative machinery designed and expressly intended to redress the precise harm that plaintiff Monk has complained of in the case at bar." Slip op. at 11. *See also Taterka v. Wisconsin Telephone Co.*, footnote 1, *supra*.

In short, then, courts dealing with novel uses of the antitrust acts have not been so ingenuous as the plaintiffs' ingenious. Al-

though we see the *Monk* case and this case as less remote from antitrust theory than the earlier cases, we will follow that trend.

The complaint in this case, at count three, incorporates the earlier Title VII and civil rights claims, cites § 1 of the Sherman Act and § 4 of the Clayton Act, and states:

> By reason of the foregoing, since 1963, and for years prior thereto, Defendants have entered into an unlawful agreement, combination, or conspiracy among themselves and the members of Pittsburgh Buildings Association to boycott women and to prevent women from obtaining higher paying jobs in positions in Defendants buildings and the buildings owned or operated by the members of the Pittsburgh Buildings Association by agreeing among themselves to fix the salaries which each would pay to women, by restricting transfers of female employees among them, by limiting the jobs which they would make available to women and by engaging in the acts set forth in Counts One and Two above, all in restraint of the interstate trade and commerce of the United States.

> WHEREFORE, Plaintiffs pray judgment against Defendants and against each member of the Defendant class in Plaintiffs' favor and in favor of each member of said class:

> (a) Enjoining the continuance by Defendants of the unlawful combination, agreement, or conspiracy in restraining of interstate trade, in violation of the antitrust laws;

> (b) Requiring Defendants to pay over to Plaintiffs and to members of the class treble damages and attorneys' fees; and

> (c) Such other relief as the Court deems appropriate.

Although this count incorporates the Title VII claim, it is, in effect, simply a restatement of that claim in the terminology of antitrust. What count one terms as individual and concerted action to "enact and effect employment policies and procedures of discrimination against females," count two (the now-defunct civil rights claim) termed a conspiracy "to deprive plaintiff . . . of protections and privileges of employment equal to those accorded to male employees because of an intent to discriminate against females," and count three styles as a conspiracy "to boycott women and to prevent women from obtaining higher paying jobs . . . in restraint of the interstate trade and commerce of the United States."

When asked at oral argument how the defendants' alleged conduct restrained trade, plaintiffs' counsel responded "it is the boycott of women from certain jobs, and the agreement, of course, to fix the wages which they would pay . . . [the women were] unable to get an employment contract reflecting the free market or true value of their services."

It is possible to conceptualize the plaintiffs and defendants here as market entities in a vertical restraint diagram—the plaintiffs on one level and the defendants on another. To make the picture conform more to reality we would have to add to the plaintiffs' level all the male employees with whom they would be "competing" for jobs offered by the defendants. This conceptual scheme forces us to designate the labor of the employees as the pertinent market for antitrust purposes with only two competitors—a class of males versus one of females. If the alleged conspiracy among the defendants were proven, all that would be established would be that women laborers were disadvantaged while male laborers were not. Since, pursuant to the union contract, all women were paid approximately the same wages and all men were paid approximately the same wages, no competition among the women plaintiffs could be restrained. The only possible "anticompetitive" effect is that of preventing all women from competing with all men to earn the wages normally paid to men—or, what is more forthrightly called "sex discrimination." Under the language of the Supreme Court's *Brunswick* opinion, *supra*, 429 U.S. at 489, 97 S.Ct. at 697, plaintiffs must allege and prove "antitrust injury" of the type "the antitrust laws were intended to prevent." Plaintiffs have directed us to no precedent nor portion of the Sherman or

Clayton Acts' legislative history to demonstrate that the antitrust laws were intended to prevent commercial activity with a purely sexually-based purpose or effect.

Because we hold that the plaintiffs have failed to state a claim cognizable under the antitrust laws we need not reach the defendants' alternate, or perhaps complementary, argument that Title VII preempts the antitrust claim. There is strong logic to the argument advanced by defendants that allowance of the antitrust claim would bypass the administrative procedures and frustrate the purposes behind Title VII. One other court has so held. *Monk v. Island Creek Coal Co., supra.* However, we do not believe that the United States Supreme Court's recent decision in *Great American Federal Sav. & Loan Assn. v. Novotny,* —— U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), controls this question. Although the Supreme Court held that violations of Title VII could not be redressed by resort to the Civil Rights Act of 1871, 42 U.S.C. § 1985(3), much of the Court's opinion turned on the structure of § 1985(3) as providing a remedy rather than substantive rights. Allegations under the two statutes did not "involve two 'independent' rights." —— U.S. at ——, 99 S.Ct. at 2352, 60 L.Ed.2d at 967. The two statutes in the case before us, although novel and, in many ways, incompatible bedfellows, do present independent statutory rights. We cannot say that *Novotny's* holding that Title VII preempts § 1985(3) requires a similar preemption of antitrust claims. Our holding today is limited to the failure of these plaintiffs to state an antitrust claim where the only market competition is that between a group of males and a group of females.

## Defendants' Class Action

The only claims remaining in this litigation are the Title VII claim and the Labor Management Relations Act claim. We have previously held that a defendant class could not be certified under Title VII. The labor claim is asserted against only one defendant. Since the § 1985(3) and antitrust claims have been dismissed, the issue of whether a class of defendants should be certified on those claims has become moot.

## Plaintiffs' Class Action

This case should proceed as a plaintiffs' class action pursuant to Fed.R.Civ.P. 23(a) and (b)(2).

The number of females similarly situated to the named plaintiffs—from 100 to 600 persons—is sufficiently great to meet the 23(a) numerosity requirement. In a recent sex discrimination suit brought in this district, Chief Judge Weber of our Court certified a class of forty-two female employees who had been classified exclusively as janitresses or light custodians by an employer. *Morris v. City ,of Pittsburgh,* CA 77-1256 (W.D.Pa. March 22, 1979). Other federal courts have certified classes ranging in number from twenty-one to thousands. 3B Moore's Federal Practice ¶ 23.05 (2d ed. 1978). We are convinced that the number here makes "joinder of all members impracticable" in the language of Rule 23(a)(1).

The related requirements of 23(a)(2) and (3)—commonality of questions and typicality of claims—have also been established. The questions common to the plaintiffs are whether they have been invidiously classified into lower paying jobs on the basis of their sex and whether their union has failed to adequately represent their interest in equal employment .opportunities. These questions are typified by the situations of the two named plaintiffs. Although the two named plaintiffs may differ in some respects from other individuals in the class, their interests are coincident with those individuals in the issues involved in this lawsuit. *Karan v. Nabisco,* 78 F.R.D. 388 (W.D.Pa.1978). Moreover, the fact that plaintiff Samson has become disabled does not preclude her representation of others to redress past employment policies. *Hackett v. McGuire Bros., Inc.,* 445 F.2d 442 (3d Cir. 1971).

We also find the Rule 23(a)(4) requirement of adequacy of representation by the named individuals to be satisfied. In addition to the similarity of the claims of Ms. Samson and Ms. Marchwinski to the claims of others in the class, they will undoubtedly continue to pursue the interests of the absent members as vigorously as they have done for almost four years. There can be

no question that plaintiffs' counsel is experienced in this type of litigation and has the capacity and resources to conduct class litigation. *See Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 247 (3d Cir. 1975).

Plaintiffs have alleged, and preliminary discovery confirms, that the defendants in this case have, in the language of Rule 23(b)(2), "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . ." Although damages are sought as well as injunctive relief, that fact has been held not to preclude certification of a Rule 23(b)(2) class. *Presseisen v. Swarthmore College,* 71 F.R.D. 34 (M.D.Pa.1976). Class certification under 23(b)(2) is favored when the gravamen of the complaint is employment discrimination. 3B Moore's Federal Practice ¶ 23.40[1].

Although the plaintiffs have claimed to have suffered common injuries from the defendants' conduct, two distinct kinds of illegal conduct have been alleged and have survived motions to dismiss—sex discrimination and failure to adequately represent. Although the sex discrimination charge involves all three of the remaining defendants, and all three were respondents before the EEOC, the charge under the Labor Management Relations Act involves only the union defendant. Moreover, looking at the case from the defendants' point of view, the named defendants in this case are not coextensive with the class of plaintiffs. The union is statutorily responsible for dealing fairly with all its female employees; likewise, its obligation under Title VII extends to all its members. However, the defendants Oliver Tyrone Corporation and Oliver Realty, Inc. (now Pittsburgh Building Properties, Inc.), are liable for only the Title VII injuries, if any, to those employees who have worked in buildings under their control. Therefore, although we view one large class of plaintiffs with two claims against the union, we must limit, by use of a sub-class designation, the number of plaintiffs to whom the other defendants might be liable under the sex discrimination claim. The two named plaintiffs will be the representatives of the larger class and the narrower one within it.

This Court will therefore certify a class of all present and past female members of the Building Service Employees' International Union, AFL–CIO, Local # 29, who have been employed as cleaning personnel under a bargaining agreement negotiated by such union and who could have filed charges with the EEOC on or after October 27, 1972, as well as all females who may be so employed in the future.

This class may proceed with its claims against the defendant union.

We shall also certify a sub-class to be composed of all persons within the larger class who have been employed in buildings owned, operated, or managed by the defendants Oliver Tyrone Corporation and Oliver Realty, Inc. (now Pgh. Building Properties, Inc.) This sub-class may also proceed against the non-union defendants.