Thomas J. DALEY

v.

ST. AGNES HOSPITAL, INC., Board of Trustees of St. Agnes Hospital, Sister Anthony Consilia.

Civ. A. No. 76–170.

United States District Court, E. D. Pennsylvania.

June 3, 1980.

Sandra Swenson, Philadelphia, Pa., for plaintiff.

Cornelius C. O'Brien, Richard M. Shusterman, Joan D. Katz, White & Williams, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

This opinion addresses the question whether a male nursing director, who claims that he was discharged from his position and subsequently "blacklisted" by his former employer because of his vigorous advocacy of the rights, privileges, and professional status of his predominantly female nursing staff, can identify in an extensive pretrial discovery record, or supply by affidavit, a genuine issue of material fact such as will get him by the motion for summary judgment interposed by all defendants with respect to his civil rights claims under 42 U.S.C. § 2000e–3 and 42 U.S.C. § 1985(3) and his antitrust claims under 15 U.S.C. § 1. The factual background of the case is as follows.

The plaintiff, Thomas J. Daley (Daley) is the former director of nurses at St. Agnes Hospital, now known as St. Agnes Medical Center, in Philadelphia. During the winter of 1974–75 Daley became the focus of widely publicized controversy, in the course of which he was discharged. The Hospital, its administrator, Sister Anthony Consilia, and its Board of Trustees are the defendants, targets of Daley's contention that his discharge was an act of sex discrimination prompted by his vigorous advocacy of the rights, privileges, and professional status of his nursing staff. It is uncontested that the nursing profession is traditionally overwhelmingly female. Daley's maleness is inconsequential to his claim.

While this contention would ordinarily form the basis for a Title VII claim, Daley concedes that such a claim is time-barred,

for Title VII, in 42 U.S.C. § 2000e–5(e), requires that a charge must be filed with the Equal Employment Opportunity Commission (EEOC) "within one hundred and eighty days after the alleged unlawful employment practice occurred." Daley was discharged on January 10, 1975, but did not file his charge with the EEOC until December 19, 1975, almost a full year later. Thus, it is agreed that, to prevail, Daley must establish unlawful employment practices by defendants *after* June 22, 1975, i. e., within one hundred and eighty days before the filing of his charge with the EEOC. To that end, Daley contends that St. Agnes engaged in illegal retaliatory conduct, which began with Daley's discharge and continued after June 22, 1975 throughout the 180 day statutory time period. The retaliation, Daley alleges, was effected in concert with other hospitals to the end of preventing him from securing a new position in nursing administration. This was allegedly accomplished by issuing unfavorable references and by placing Daley's name on a "blacklist."

In addition to his Title VII claim, Daley asserts a cause of action under the Sherman Act, 15 U.S.C. § 1, claiming that the conspiracy to deprive him of comparable employment following his discharge constituted a group boycott in violation of the antitrust laws. Furthermore, he maintains that 42 U.S.C. § 1985(3) provides him a remedy on three bases: that defendants' conspiracy interfered with his right to travel by depriving him of his opportunity to support himself outside the state; that the conspiracy interfered with his First Amendment rights to freedom of speech and association; and that 1985(3) can be used to redress his statutory right to be free of defendants' violation of the Sherman Act.[1] He also asserts pendent state claims of defamation and interference with advantageous business relations.[2]

---

1. Plaintiff's complaint originally asserted that 1985(3) provided a cause of action for sex discrimination. That argument was subsequently undermined by the Supreme Court in *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), which held that § 1985(3) may not be used to

redress violations of Title VII. See Part V, *infra*.

2. Daley's claims were not all interposed in his original complaint, which was filed on January 20, 1976, alleging causes of action under 42 U.S.C. §§ 1981, 1983, and 1985(3) and including

Defendants deny committing any discriminatory or conspiratorial acts. They deny discussing Daley with any other hospital; deny issuing any references, favorable or unfavorable, during the relevant one hundred and eighty day period; and insist that Daley was discharged not for his advocacy of nurses' rights, but for his unwillingness to cooperate with other department heads, a cooperation described as essential to adequate job performance. They suggest that any difficulty experienced by Daley in securing comparable employment stems not from their actions, but from the widespread publicity which accompanied his discharge, making him persona non grata to other hospital administrators. The defendants disclaim responsibility for the publicity and further assert that they cannot be held liable for consequences flowing therefrom.

In March of 1977, defendants moved to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), or in the alternative for summary judgment. In July of 1978, following extensive briefing and oral argument, we dismissed plaintiff's claim under 42 U.S.C. § 1981 by agreement of the parties; granted summary judgment for defendants on plaintiff's claim under 42 U.S.C. § 1983 for lack of state action; denied defendants' motions with respect to plaintiff's claims under 42 U.S.C. § 1985(3) and under Title VII, 42 U.S.C. §§ 2000e–2 and 2000e–3; and reserved defendants' motion on plaintiff's Sherman Act claim pending further discovery. Since that time, the parties have engaged in extensive discovery; the record for summary judgment includes numerous affidavits and depositions. We held oral argument on defendants' motion for summary judgment on April 11, 1980,[3] and, after examining the record before us, we conclude that summary judgment for the defendants is appropriate on all counts.

## II. The Facts of Record

The following are the material facts of record as they have been developed in discovery and by affidavits. Daley was employed by St. Agnes Hospital in May, 1972 as Director of Nursing Services and was promoted in May, 1973 to Director of Nursing Affairs. In this capacity, he was responsible for the St. Agnes School of Nursing, the supervision of nursing services, and nursing staff development, including the hiring, promoting, firing, and future planning for nursing services. While Daley was employed by St. Agnes, the nursing staff was overwhelmingly female, while the medical staff was predominantly male.

During Daley's two and one-half year tenure at St. Agnes, conflict developed between the nursing department and other departments of the hospital, primarily the medical staff. While the causes of this conflict are in dispute, it is plain that considerable acrimony was engendered. The discord apparently centered around the appropriate role of nurses vis-a-vis doctors. For example, some physicians demanded a role in the hiring and promotion of nurses within their units on the grounds that positive working relationships were essential to the smooth operation of the unit. The nursing staff believed such a role for the medical staff to be inappropriate, maintaining that only nursing professionals are competent to assess the qualifications of nurses, and that nursing supervisory personnel bore ultimate legal responsibility for their nurses' performance. To allow physicians to interfere in the process would be to abdicate their own responsibilities, leaving them open to potential legal liability, the nurses believed.

In addition, the record discloses a number of instances, not denied by St. Agnes, of nurses being verbally abused, often in front of patients or relatives. Nurses were called "idiots," "aggressive bitches," and homosex-

the pendent state claims. He later amended his complaint to include the Sherman Act claim. He further amended his complaint to include his Title VII claim upon exhaustion of his administrative remedies, i. e., after dismissal of his claim and issuance of a Notice of Right to Sue by the EEOC on February 3, 1977.

3. A major factor in the additional delay was the lengthy illness and subsequent withdrawal of plaintiff's original counsel, followed by time-consuming difficulties in his retaining new counsel.

uals, and were told that "Italian women take orders" and "nurses don't make judgments." Teaching nurses were accused of inculcating disrespect for doctors in student nurses. Bouts of public screaming were apparently not uncommon. These incidents were typically ignited when a nurse questioned a doctor's orders or took it upon herself to suggest some procedure, thereby incurring the physician's wrath.

The picture which emerges is of a bitterly divided hospital, with doctors pitted against nurses. While there is some testimony to support plaintiff's characterization of the situation as one in which the medical staff was seeking to ensure the continued subservience of nurses, for purposes of this motion we need not make such a finding. In any event, it was determined that the hospital could not continue to function in such a divisive manner and, whether justifiably or not, Mr. Daley, as head of the nursing staff and a vocal advocate of the nurses' position, was identified as the source—or at least the center—of the discord. Accordingly, despite his consistently superior performance evaluations by his supervisor, Mr. Larkin, Associate Administrator of the Hospital, his termination was sought.[4]

On December 16, 1974, the hospital's medical staff recommended that the administration request Daley's resignation because of his failure to rectify the numerous problems they perceived in the Nursing Services Department. On January 9, 1975, a special meeting of the defendant Board of Trustees was convened to discuss the by then explosive situation. The Board decided that the problem was an administrative one, and voted to accept any disposition of the matter adopted by the Administrator, defendant Sister Anthony Consilia. On January 9, 1975, following the Board meeting, Sister Anthony Consilia requested Mr. Daley's resignation, but Daley refused to resign voluntarily. Accordingly, on the following day, Sister Anthony discharged Daley, effective immediately. Mr. Daley was informed that his termination was "for inability to communicate and cooperate with other departments." Shortly after the discharge, nurses picketed the hospital in protest, receiving wide-spread attention in the Philadelphia area media and in the nationwide nursing press.

Upon the petition of Daley's supervisor, Mr. Larkin, who had been discharged at the same time, the Members of the Corporation of St. Agnes Hospital, Inc. directed the Board of Trustees[5] to establish an impartial fact-finding committee to investigate Daley's firing. The committee met and heard testimony on January 20, 1975, and on January 21 unanimously recommended that the Members of the Corporation affirm the decision of the Administrator.

Daley has had no success in securing another position in hospital administration. Although he applied to more than 25 hospitals over a three-year period, the only positions he has been able to secure are teaching positions at several colleges, at a considerably lower salary. Around the middle of June, 1975, he was offered a position as a hospital administrator at Northwestern Psychiatric Institute, only to have the offer rescinded the following day. Daley's St. Agnes experience is noted on his resume, and he freely discusses that position at employment interviews. He has, however, never requested references from the St. Agnes administration, and the administration has denied supplying any references within the relevant statutory period.[6] On

---

4. Mr. Larkin had submitted his resignation in October of 1974, but had remained in his position, according to Sister Anthony Consilia, "to wait out time." Because of the close relationship between Larkin and Daley, however, Larkin was terminated by the hospital at the same time as was Daley.

5. The Members of the Corporation are the corporate directors of the hospital, which is sponsored by the Sisters of St. Francis of Philadelphia. The Board of Trustees, answerable to the corporation, oversees management of the hospital.

6. The hospital did receive two telephone requests for references outside the statutory period. Mr. McLaughlin, St. Agnes' Director of Personnel, testified that he gave a "positive" reference over the telephone in response to one request from Philadelphia's Episcopal Hospital, and requested, but never received, a written reference request from the second, St. Christopher's Hospital, also in Philadelphia.

June 1, 1976, after the applicable time period, St. Agnes Hospital did return, at the request of the Morris Park Nursing Home in New York, a printed reference form. On this form Daley was rated average or above in most categories, with the exception of "cooperation," in which he was rated poor. This form also disclosed the fact that Daley had been terminated and would not be re-employed, yet recommended that Daley be hired for the position.[7]

While the foregoing recitation hardly seems extensive, given the vintage of the case and the magnitude of the claim, it includes all of the evidence we have been supplied on the points at issue. Except by way of background, we have not chronicled any facts bearing on the question whether Daley was discharged in retaliation for his advocacy of nurses' professional rights, nor on the question whether the hospital's actions constituted sex discrimination on the basis of traditional views of the female nursing role as a menial one, for the legality of Daley's discharge is not before us.[8] Rather, we are asked to find that plaintiff has not created a material factual issue as to subsequent retaliatory acts between June 22, 1975 and December 19, 1975.[9] We turn first to plaintiff's Title VII claims.

### III. The Title VII Claim

42 U.S.C. § 2000e–3(a) provides:

(a) It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . [or] . . . to discriminate against any individual . . . *because he has opposed any practice made an unlawful employment practice by this subchapter,* or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. (emphasis added).

Daley claims that he was discriminated against for opposing St. Agnes Hospital's practice of relegating nurses, who are almost all women, to an inferior position. While he is barred from contesting his discharge, *see* p. 1311, *supra,* he contends that the hospital continued its retaliatory conduct by issuing unfavorable references and by "blacklisting" him.

■ Giving unfavorable references may, in appropriate circumstances, constitute discriminatory conduct by an employer against his employee. *See Shehadeh v. Chesapeake & Potomac Telephone Co.,* 595 F.2d 711 (D.C.Cir.1978). The only appellate court to consider the issue held that a claimant who has experienced discriminatory action at the hands of his employer states a cause of action under the "opposition" clause of Title VII so long as he reasonably believes the employment practice he opposes constitutes unlawful discrimination under Title VII. *Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir. 1978). *See also Hearth v. Metropolitan Transit Commission,* 436 F.Supp. 685 (D.Minn.1977); *but see EEOC v. C & D Sportwear Corp.,* 398 F.Supp. 300 (M.D.Ga.1975). However, the claimant's opposition must take a protected form so as to balance "the purpose of the Act to protect persons engaging reasonably in activities opposing sexual discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222, 231 (1st Cir. 1976).

■ We need not decide whether plaintiff "reasonably believed" St. Agnes' handling of the nursing staff to be unlawful

---

7. The bizarre fact that plaintiff had never applied to Morris Park Nursing Home and that the request for a reference was in response to the application of a fraudulent Thomas Daley, who was awarded the position but was discharged when his fraud was discovered, is irrelevant for the purposes of the inference which plaintiff seeks to draw from this reference form.

8. The bulk of the deposition testimony describes the tense atmosphere which prevailed in the hospital prior to Daley's discharge, details a number of specific incidents of conflict between physicians and nurses, and discusses the philosophical disagreement between the medical and nursing staffs.

9. *See* p. 1311, *supra.*

under Title VII or whether his opposition took a protected form, because he has completely failed to establish any factual basis for his allegations of retaliation. Plaintiff contends that his inability to secure an administrative position despite his ample qualifications [10] was caused by illegal retaliatory actions by St. Agnes, namely, that St. Agnes issued unfavorable references to potential employers, and that the hospital placed his name on a "blacklist." But plaintiff has not adduced any evidence that St. Agnes issued any references, favorable or unfavorable, within the relevant time period, or otherwise participated in any "blacklist." Although he has stated that he applied to five hospitals within the 180 days prior to his filing of charges with the EEOC, he has presented no evidence that any of these employers had any communication whatsoever with St. Agnes. Plaintiff cannot defeat defendants' Motion for Summary Judgment, which is accompanied by sworn affidavits and buttressed by deposition testimony denying that St. Agnes supplied any references for Mr. Daley during the relevant time period, by relying on mere unsupported allegations. He must refute those affidavits with specific facts based upon sworn personal knowledge. F.R.Civ.P. 56(e). No depositions were taken from officials of the hospitals to which plaintiff applied during the relevant time period. Although plaintiff avers that those officials would be unwilling to cooperate because of their participation in the alleged conspiracy, there is no evidence to that effect, and moreover, that is an insufficient excuse for failure to comply with the requirements of Rule 56(e). *See State Mutual Life Assurance Co. v. Deer Creek Park,* 612 F.2d 259, 268 (6th Cir. 1979).

Plaintiff offers the arguably unfavorable subsequent reference supplied to the Morris Park Nursing Home, *see* note 7 and accompanying text, *supra,*[11] as the basis for an inference that there must have been equally unfavorable references during the interim time period. But this inference simply cannot be drawn without some evidence during the relevant time period to rebut the hospital's sworn denials. In addition, plaintiff offers various items of hearsay evidence to the effect that St. Agnes was in part responsible for his inability to secure comparable employment.[12] He also submits that because one of "his" nurses received an unfavorable reference, he must have as well. But plaintiff must produce admissible, *i. e.,* non-hearsay, evidence which tends to prove that adverse references were issued on *his* behalf. F.R.Civ.P. 56(e). Similarly, the withdrawal of a job offer without explanation fails to support Daley's contention that St. Agnes must have interfered when such interference has been specifically denied under oath.

Finally, plaintiff maintains that some references must have been sent out because St.

---

**10.** Daley suggests we infer retaliatory action from the fact that he was often the most qualified applicant for the positions for which he applied. This we cannot do, however, for there is no evidence in the record as to the qualifications of other candidates for those positions.

**11.** We note that this reference cannot have been *too* unfavorable, for the fraudulent Mr. Daley was hired in part on the basis thereof.

**12.** For example, Gloria Donnelly, who had been Director of St. Agnes Hospital of Nursing, and who resigned when Daley was terminated, testified that St. Agnes' public relations officer, Arthur O'Leary, called on her at her home shortly after Daley's discharge to tell her that if she did not cease giving information to the press, he would reveal information which would damage Daley's career. Mr. O'Leary was not deposed, however. Other testimony relates to allegedly negative references given by St. Agnes on behalf of other nurses. In addition, Gail Eversole, who was terminated from her nursing position at St. Agnes at approximately the same time as Daley, stated in her affidavit that she was told by faculty at the University of Pennsylvania, where she returned for further study when she was unable to secure new employment, that she would "have no trouble if [she] avoided discussing the Saint Agnes issue, denied knowing Mr. Daley or in any way acknowledging support of him." Ms. Eversole further testified that, over a year after the St. Agnes incident, a Mr. Harley of the Health Science Center, when discussing employment with Ms. Eversole, mentioned that Mr. Daley would *never* get a management job in Philadelphia and that he should move out of the area. Neither Mr. Harley nor the University faculty members were deposed. Other evidence was of the same tenor.

Agnes' personnel director, Mr. McLaughlin, and his superior, the Executive Vice President, Mr. Callaghan, told him throughout 1975 and 1976 that favorable references were being sent. There is, however, no affidavit or deposition testimony by Daley to that effect. On the other hand, Callaghan and McLaughlin have both denied speaking with Daley during that time period. Indeed, the only evidence Daley presents to support his false assurances theory relates to deposition testimony by Callaghan and McLaughlin regarding references outside the statutory period, see notes 6 and 7, supra. Thus, the "false assurances" claim, alleged for the first time in the final brief, is without foundation.

With regard to the blacklist claim, again plaintiff has offered only hearsay evidence. Defendants attempted to trace the reports of a blacklist, deposing the various persons who were mentioned as hearsay declarants. All testified that they had no personal knowledge of such a blacklist.[13] Reports of a blacklist must therefore be seen as unsubstantiated rumor, and not as raising a material factual issue.

■ Apparently recognizing the insubstantiality of his evidence as to retaliatory acts during the statutory time period, plaintiff argues that equitable considerations should toll the time period under the doctrine of equitable modification, which applies when illegal acts are not apparent to a potential plaintiff, especially when defendants conceal their actions. See Hart v. J. T. Baker Chemical Co., 598 F.2d 829 (3d Cir. 1979); Williams v. Department of Navy, 472 F.Supp. 747 (E.D.Pa.1979). Plaintiff's theory is that he was unaware until late summer of 1975 that he was the target of retaliation because defendants had falsely assured him that he was receiving positive job references, thus concealing their illegal

retaliatory behavior. But for the reasons discussed at pp. 1315–1316, supra, there is no evidence of any such false assurances. Moreover, the concealment issue was never mentioned in previous briefs, nor were questions addressed to that issue asked of any deponent. Thus there is no evidence to support plaintiff's contention that defendants' concealment of unlawful activities should induce us to apply the doctrine of equitable modification to toll the 180 day time period in order to permit the introduction of evidence from an earlier time.

It is apparent from the foregoing discussion that plaintiff has failed to present a factual basis to support his allegations sufficient to raise a material issue of fact in light of defendants' sworn affidavits. While we are sympathetic to Mr. Daley's plight, we are constrained in view of the foregoing discussion to grant defendants' motion for summary judgment on the Title VII claim.

### IV. The Sherman Act Claim

■ Plaintiff alleges that St. Agnes and other unnamed hospitals conspired to prevent him from obtaining employment in hospital administration, and that this conspiracy was a group boycott in restraint of trade within the meaning of the Sherman Act, 15 U.S.C. § 1. As we explained in connection with the Title VII claim, supra, plaintiff has come forward with no evidence of any conspiracy or agreement or of any retaliatory conduct. While it is true that plaintiff is not restricted to the same 180-day time period to press his Sherman Act claim, we do not believe that the arguably unfavorable Morris Park reference which followed institution of this lawsuit or the avowedly favorable earlier telephone references, see pp. 1313–1314, supra, are sufficient to raise a material issue of fact regarding an antitrust conspiracy. And

---

**13.** Olga Kotalik, former Director of Nursing Services at St. Agnes, was the most frequently named source of knowledge of a blacklist, but Ms. Kotalik denied having any personal knowledge thereof. The only other evidence of a blacklist was the statement by Gloria Donnelly, former Director of the School of Nursing, that she received a call from a nursing recruiter at Pennsylvania Hospital, requesting references for two nurses who had resigned from St. Agnes. Ms. Donnelly asked, "Oh, you are not honoring the blacklist?" and the recruiter replied, "No, we think that's ridiculous." But the recruiter was not questioned by Ms. Donnelly as to whether she was referring to an actual blacklist or to rumors of one, nor was she deposed.

there is simply no other evidence. In cases charging conspiracy, denial of the conspiracy by defendants' affidavit or deposition testimony is sufficient, under Rule 56(e), to shift the burden to the plaintiff to establish a factual question by the offering of evidence of the conspiracy. *See e. g. First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Lamb's Patio Theatre, Inc. v. Universal Film Exchanges, Inc.,* 582 F.2d 1068 (7th Cir. 1978). This plaintiff has not done.

■ There are two additional bases for granting summary judgment for defendants on the Sherman Act claim. First, plaintiff has failed to establish that defendants' alleged conduct was "in commerce" or "affected" interstate commerce, a necessary prerequisite for invoking Sherman Act jurisdiction. *See e. g. McLain v. Real Estate Board, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980). In attempting to make out a showing of effect on interstate commerce, plaintiff has listed a number of factors showing that St. Agnes is "in commerce": out-of-state patients, interstate transport service, use of interstate media for recruiting purposes, purchase of supplies interstate, and so on. Such factors, plaintiff maintains, were sufficient to overcome a jurisdictional challenge in *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

There is a significant difference between *Hospital Building* and the case at bar, however. In that case, the activity complained of, a conspiracy to restrain trade in furnishing medical and surgical services, was held to have an interstate impact. It is plain that, to meet the necessary jurisdictional requisite, the alleged violation must have some nexus with interstate commerce. *See McLain, supra* ; *Hospital Building, supra* ; *Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir. 1973). In *McLain,* for example, which alleged an agreement among real estate brokers to

conform to a fixed rate of brokerage commissions, it was respondents' brokerage activity which had to affect commerce. While the unlawful conduct itself need not affect commerce, there must be some relationship between the alleged illegal activity and commerce. Plaintiff has shown no relationship between his supervisory nursing duties or his discharge and interstate commerce.

Furthermore, plaintiff cannot argue that his inability to find employment in surrounding states provides that nexus with interstate commerce, for "the labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17. Thus even if plaintiff had proffered facts showing that restraints were placed upon the marketing of his services, and even if those restraints curtailed competition among employees, he would not have established a combination or conspiracy in restraint of trade or commerce without some further evidence of anti-competitive effect other than with regard to labor. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Taterka v. Wisconsin Telephone Co.,* 394 F.Supp. 862 (E.D.Wis.1975), *aff'd,* 559 F.2d 1224 (7th Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 402, 54 L.Ed.2d 281 (1977). Since plaintiff has come forward with no other facts which show an effect on commerce, no showing of a nexus between defendants' activities and interstate commerce sufficient to allow the case to proceed to trial has been presented.[14]

■ The final ground for rejecting plaintiff's Sherman Act claim is our view that the Sherman Act does not provide a remedy for what are in actuality Title VII claims. We are persuaded by the reasoning of those courts that have recently rejected the contention that Sherman Act and Title VII remedies are co-extensive. *See Marchwinski v. Oliver Tyrone Corp.,* 83 F.R.D. 606 (W.D.Pa.1979); *Monk v. Island Creek Coal Co.,* 1979–2 Trade Cases ¶ 62,821 (W.D.Va.

14. *See Mortensen v. First Fed. Sav. & Loan Ass'n.,* 549 F.2d 884 (3d Cir. 1977). For a discussion of jurisdictional proof required under the antitrust laws *see Zenith Radio Corp. v.* *Matsushita Elec. Indus. Co.* (opinion on subject matter jurisdiction), MDL No. 189 (E.D.Pa. April 14, 1980).

**1318**

1979); *NAACP v. New York Clearing House Ass'n*, 431 F.Supp. 405 (S.D.N.Y. 1977). As explained by the *Monk* court, "by simply phrasing their claim in terms of the malleable term 'competition' and bringing in a civil action sounding in antitrust, plaintiffs could easily circumvent the vital administrative procedure of Title VII and virtually eliminate the EEOC's role as conciliator, thereby frustrating a major policy behind the statute." 1979-2 Trade Cases at 78,762. Furthermore, in addition to the policies of Title VII,[15] the policies of the antitrust laws counsel dismissal on this ground, for as discussed in the cases cited *supra*, plaintiff has not suffered an injury of the type contemplated by the antitrust laws as described in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

We disagree with plaintiff's contention that *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) requires a contrary result. *Johnson*, which held that the remedies under Title VII and 42 U.S.C. § 1981, although related, are independent, relied very specifically upon explicit Title VII legislative history to that effect. There is no comparable legislative history with regard to the Sherman Act. Moreover, we are not saying that the Sherman Act and Title VII are not independent of one another, for they plainly are. What we are saying is that there is no cognate relationship between Title VII and the antitrust laws as there is between Title VII and § 1981, both of which redress race discrimination. Put differently, the type of

injury redressed by Title VII is not related to the type of injury cognizable under the antitrust laws, for the Sherman Act provides no remedy for sex discrimination. Hence *Johnson* is inapposite.[16]

For the foregoing reasons, defendants' motion for summary judgment on the Sherman Act claim will be granted.

## V. The 1985(3) Claim

Plaintiff concedes that the allegations of a Title VII violation cannot provide the substantive anchor for recovery under 42 U.S.C. § 1985(3) in light of the recent Supreme Court decision in *Great American Federal Savings & Loan Ass'n. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).[17] He continues, however, to press his 1985(3) theory on alternative grounds, asserting that 1985(3) provides a remedy for the alleged private conspiracy of defendants to: (1) interfere with his right to travel by depriving him of job opportunities in other states; (2) deprive him of his First Amendment rights to freedom of speech and association; and (3) deprive him of his statutory right to be free of defendants' violations of the Sherman Act.

Defendants would have us hold that the absence of evidence of conspiracy, discussed *supra*, necessarily disposes of all these theories. We disagree, for that discussion focused on evidence within the 180-day statutory period of Title VII, a time limitation not valid for plaintiff's broader 1985(3) claims. Nonetheless, we have little difficul-

---

**15.** The Supreme Court's emphasis in *Great Am. Fed. Sav. & Loan Ass'n. v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) on the importance of Title VII's administrative procedures further buttresses our conclusion that those procedures should not be bypassed through resort to alternative remedies.

**16.** We are also troubled by the notion that a treble damage award might be available to a Title VII plaintiff.

**17.** *Novotny* held that section 1985(3) creates no substantive rights itself, but is a purely remedial statute, providing a cause of action for breach by conspiracy of those other federal rights which it designates. While the court did not delineate precisely which federal rights are

included, it did hold that 1985(3) does not provide a remedy for violations of Title VII.

The facts in *Novotny* are strikingly similar to those in the case at bar. Plaintiff, a male loan officer, member of the board of directors, and Secretary of the Association, was terminated and removed from office, allegedly for supporting equal rights for female employees at a meeting of the board of directors. Emphasizing the administrative and procedural aspects of Title VII, the Court held that unimpaired effectiveness of the plan Congress created under Title VII can only continue if that procedure remains the sole remedy for the rights which it creates. Thus a right created by Title VII cannot be the basis for a cause of action under 1985(3).

ty resolving these 1985(3) issues in defendants' favor.

■ The right to travel argument is plainly inapposite. Those cases, such as *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), which discuss the right to travel interstate, do so in terms of some burden (usually a statute) which places undue hardship on an individual who wishes to move into a given state. In this case, plaintiff alleges that defendants' activities prevented him from obtaining employment both in Pennsylvania and in other states. In fact, most of the institutions to which plaintiff applied were in Pennsylvania. It is thus plain that plaintiff has suffered no interstate or out-of-state injury which differs in any respect from that suffered within the state. Defendants have not thereby burdened plaintiff's right to travel interstate.

With regard to the Sherman Act claim, we need not decide the question, left open by *Novotny*, whether § 1985(3) provides a remedy to redress statutory rights other than Title VII. This is because, having granted summary judgment for defendants on the antitrust count, we have removed the only other statutory claim—the Sherman Act—from the case, and if plaintiffs have no Sherman Act claim, then plainly they have no 1985(3) remedy to redress a nonexistent Sherman Act violation.

■ We pause a moment longer on plaintiff's First Amendment claim. Neither the Third Circuit nor the Supreme Court has reached the question whether private conspiracies to violate First Amendment rights are subject to redress under 1985(3). While the Third Circuit's opinion in *Richardson v. Miller*, 446 F.2d 1247 (3d Cir. 1971), appeared to implicitly countenance such a cause of action, its opinion in *Novotny v. Great American Federal Savings & Loan Ass'n*, 584 F.2d 1235 (3d Cir. 1978), *vacated*,

442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), explicitly declined to reach the issue, thus negating the implication that *Richardson* had decided the question. 584 F.2d at 1249 n. 61. We also declined to reach the question in *Carchman v. Korman Corp.*, 456 F.Supp. 730, 732 n. 3 (E.D.Pa.1978), *aff'd*, 594 F.2d 354 (3d Cir.), *cert. denied*, 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979), and earlier in *Local No. 1 (ACA) v. I. B. T. C. W. & H.*, 419 F.Supp. 263, 275–76 (E.D. Pa.1976). Outside this circuit, there is a split of authority. Compare *Murphy v. Mt. Carmel High School*, 543 F.2d 1189 (7th Cir. 1976); *Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 829 n. 33 (7th Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Bellamy v. Mason's Stores, Inc.*, 508 F.2d 504 (4th Cir. 1974); *with Westberry v. Gilman Paper Co.*, 507 F.2d 206 (5th Cir. 1975); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971).

We expressed the view in *Carchman, supra*, citing Judge Spencer Williams' opinion in *Baer v. Baer*, 450 F.Supp. 481 (N.D.Cal. 1978), that it would be unsound for a federal court, absent clear guidance from the Supreme Court,[18] to decide this enormously complex question by holding that § 5 of the Fourteenth Amendment empowers Congress to reach purely private conspiracies to violate First Amendment rights. We echoed that view in footnote 3 of our July 26, 1978 order in this case, in which we discussed the problem at some length. We see no reason to change that opinion, particularly in the wake of *Novotny*.

We stop short of holding that 1985(3) provides no remedy for private violations of the First Amendment, for we need not reach that question. We hold instead that this case cannot be distinguished from, and is thereby controlled by, *Novotny*. The case at bar is factually on all fours with *Novotny*: Daley's complaint, like Novotny's, depicts a conspiracy to deprive him of employment opportunities because of his advocacy

**18.** Justices Powell and Stevens wanted to reach the question of the scope of Congressional power under § 5 of the Fourteenth Amendment in *Novotny*, and wrote separately expressing their views that 1985(3) cannot be read expansively. Justices White, Brennan, and Marshall, the dissenters in *Novotny*, would read that section broadly. The remaining four justices have not expressed a recent opinion, and we decline to speculate as to the ultimate outcome.

**1320**

of equal protection rights for women. In 1978, when this motion was originally before us, *see* p. 1312, *supra,* and we refused to grant summary judgment for defendants on the 1985(3) claim pending further discovery, this case was in an identical posture with *Novotny,* which had at that time not yet been argued in the Third Circuit. The Supreme Court's holding in *Novotny, see* note 17, *supra,* thus controls here. It would be extremely difficult to justify a result in this case different from the result in *Novotny* based only upon a *post hoc* argument raised for the first time in the final brief and argument, four years after the institution of the suit, especially when the pleadings fail to put the claim in issue.

We therefore grant defendants' motion for summary judgment on the 1985(3) count.

## VI. *Pendent State Claims*

■ The doctrine of pendent jurisdiction is a doctrine of judicial discretion, and when a plaintiff's federal claims are disposed of before trial, even though not unsubstantial in a jurisdictional sense, the general rule is that the state claims should be dismissed as well. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Broderick v. Associated Hospital Service,* 536 F.2d 1, 8 n. 25 (3d Cir. 1976); 13 Wright, Miller & Cooper, *Federal Practice and Procedure* § 3567. By virtue of the appended order, plaintiff's federal claims have been disposed of before trial. Accordingly, we dismiss plaintiff's related state law claims of defamation and interference with advantageous business relations.

An appropriate order follows.